| | |
|---|---|
| SHELLI HOLTSMAN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-5109-cv-NKL |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Before the Court is the Social Security Complaint [Doc. # 3] filed by Shelli Holtsman on behalf of her son, K.S., a child under age 18, with an alleged disability onset date of April 1, 2010. Holtsman argues that the Administrative Law Judge ("ALJ") erred in determining that Bryce did not meet, medically equal or functionally equal a listed impairment; and in failing to provide a proper credibility analysis.

**I.    Statement of Facts[1]**

On April 19, 2010, an application for supplemental security income was protectively filed by Holtsman on behalf of K.S. It was originally alleged that the illness, injuries or conditions that K.S. suffered from were: "Autism/adhd." (Tr. at 121). It was further noted by Holtsman that:

K.S. has social issues. He is unable to relate to everyday situations.

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

> Personal hygiene is an issue. Has a very difficult time concentrating and paying attention. K.S. has been in special education classes since starting school. He has a hard time interacting with other children. He is often fighting with peers at school and church.

(Tr. at 125).

The claim was denied initially on July 8, 2010. (Tr. at 54-59). On August 4, 2010, a written request for hearing was filed on K.S.'s behalf. (Tr. at 60-62). On January 10, 2011, Holtsman appeared and testified on behalf of K.S. in Joplin, Missouri, in a hearing presided over by ALJ James Harty from Wichita, Kansas. (Tr. at 31-50). K.S. was represented by Ryan Dexter, an attorney. (Tr. at 95). At the hearing, Holtsman testified that K.S. was in special education classes due to pervasive developmental disorder (PDD) and attention deficit hyperactivity disorder (ADHD). (Tr. at 34-35). When asked if K.S. had any type of behavioral issues at school, Holtsman stated: "Yes, we have quite a few [INAUDIBLE] tends to, you know, have social awkwardness, and seems to, fight or misinterpret the actions, and words, and, and conversations of others; and to get into a lot of fights and trouble in school." (Tr. at 37). On November 30, 2009, an Evaluation Report was completed for the Joplin School District. (Tr. at 249-253). This was a routine three-year re-evaluation in compliance with the Individuals with Disabilities Education Act (IDEA). (Tr. at 249). It was noted that K.S. received special services under the categorical diagnosis of "Emotional Disturbance." *Id.* K.S. was noted to have a full scale IQ of 109, as determined by the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV). (Tr. at 250). K.S.'s adaptive behavioral skills were described as age

appropriate. *Id.* Regarding communication, it was noted that K.S. was able to communicate effectively with peers and adults in the academic setting, but "the multidisciplinary team reported social communication problems such as inappropriate responses to others. "He can be withdrawal [sic] during conversations." *Id.* The multidisciplinary team further noted that "K.S. struggles with peer interactions. He also has trouble getting focused to complete work, especially when the work is perceived as hard. He can get tasks done once he gets motivated to complete assignments." (Tr. at 251). K.S. was reported to have had five disciplinary/behavioral referrals during the period of August 2008 to May 2009, and only one referral in the current school year, the period of August 2009 to October 10, 2009. *Id.* While K.S. was found to be capable of performing grade level work in his classes, it was noted:

> As rated by his classroom teacher and compared to his grade level peers, K.S.'s study skills are a significant concern in the area of working independently, managing time well, completes class work/homework and monitoring own progress and moderate concern in the area of coming to class prepared, participating in class, accuracy of assignments, following directions and test preparation and no concern in the area of retaining information.
>
> As rated by his classroom teacher and compared to his grade level peers, K.S.'s academic behaviors are a significant concern in the area of attention span and effort and moderate concern in the area of cooperating with teachers, managing frustration, following class rules and self advocating.

(Tr. at 252-253). The multidisciplinary team also reported:

> During the period of August 2008 to present the following behavioral concerns were documented by office staff: Kyle had 5 discipline/behavior referrals during the period of August 2008 to May 2009 and 1

3

>   discipline/behavior referral during the period of August 2009 to October
>   2009. Reasons for the referrals include fighting and inappropriate physical
>   contacts. The only referral Kyle had this school year has been for
>   inappropriate physical contact.

(Tr. at 251).

It was the decision of the multidisciplinary team that K.S. continued to meet the eligibility criteria to be classified with "Emotional Disturbance." (Tr. at 204). On May 26, 2010, a teacher questionnaire was completed by Ms. Karen Sue Hensley, school counselor, and Mr. Neill, special education teacher. (Tr. at 44-152). In the form, she found that K.S. was based in a self-contained classroom eighty-eight percent of the day. (Tr. at 144). It was noted that K.S. had no problems in acquiring and using information. (Tr. at 145). Regarding attending and completing tasks, it was noted that K.S. had very serious problems in two areas of functioning, and serious problems in seven other areas. (Tr. at 147). It was noted: "He can work independently. It all depends on if he chooses to do the task. Student needs extra motivation to complete task successfully." *Id.* Regarding interacting and relating with others, K.S. was found to have serious problems in the area of seeking attention appropriately, and expressing anger appropriately. (Tr. at 148). It was noted: "He has a behavior plan, use of quiet room, he's in a self-contained classroom." *Id.* It was also noted, that on days he did not take his medicine, K.S. was encouraged to exercise as an appropriate means of releasing energy. *Id.* There were no problems noted concerning moving about and manipulating objects. Regarding caring for himself, K.S. was found to have very serious problems in

4

the area of cooperating in, or being responsible for, taking needed medication, and serious problems in the area of using appropriate coping skills to meet daily demands of school environment. (Tr. at 150). It was noted: "When student becomes frustrated he tends to chew on school supplies (paper, pens, pencils). He has refused gum to help calm self. He will also break the school supplies." *Id.* It was further noted that it was obvious when he came to school without taking his medications, based upon his behaviors. *Id.*

On November 2, 2010, Ms. Hensley and Mr. Neill completed an Individual Functional Assessment. (Tr. at 209-210). In the form, K.S. was noted to have a less than marked limitation in the areas of acquiring and using information; caring for yourself; and, health and well being. *Id.* He was determined to have marked limitations in the areas of attending and completing tasks; and, interacting and relating with others. *Id.* At the hearing, Holtsman testified that K.S. was receiving treatment for his PDD and ADHD from Charles Graves, M.D., a child and adolescent psychiatrist, and Angela Herndon, ARNP1, PMHNP2-BC3, both with the Ozark Center. (Tr. at 35). On February 26, 2009, K.S. underwent a psychiatric evaluation, performed by Dr. Graves. (Tr. at 271-273). It was noted that K.S. maintained poor eye contact throughout the interview and had to be redirected frequently to remain on task. (Tr. at 272). His speech was noted to have "an odd quality that is hard to define." *Id.* His affect was "not entirely appropriate to the setting," and his judgment and insight were noted to be impaired. *Id.* Based upon the examination, K.S. was diagnosed with PDD, NOS; provisional, and ADHD, combined type. *Id.* K.S.'s Adderall XR was discontinued and he was started on Concerta. (Tr. at

5

273). He was to be seen in approximately one month for ongoing evaluation and treatment. *Id.*

When K.S. was seen by Dr. Graves on March 30, 2009, it was noted: "On mental status exam today the young man describes his mood as angry, frustrated, coughing, enraged, depressed and bored on his feelings chart. His affect is somewhat constricted. His eye contact remains poor . . . . Judgment and insight are impaired for his age." (Tr. at 270). K.S.'s dosage of Concerta was increased. *Id.*

K.S. continued to be seen by Dr. Graves, until February of 2010, when he began treating with Ms. Herndon. (*See* Tr. at 276-279).

On May 27, 2010, Ms. Herndon noted that an incident had occurred in which K.S. had refused to clean his room, which escalated to him shoving his mother. (Tr. at 276). The police were called, and they explained to K.S. that shoving and hitting others is against the law and gave him a warning. *Id.* K.S. and his mother were noted to have since started working together on cleaning his room. *Id.* Ms. Herndon reported that K.S. had "experienced challenges with distractibility, impulsivity, inattention and hyperactivity." *Id.* It was determined that K.S.'s dosage of Concerta would be increased. *Id.*

On June 22, 2010, Ms. Herndon completed an Individual Functional Assessment. (Tr. at 160-161). In the form, K.S. was noted to have marked limitations in the areas of acquiring and using information; attending and completing tasks; interacting and relating with others; caring for yourself; and, health and physical well-being. *Id.* He was

determined to have a less than marked limitation in the area of moving about and manipulating objects. (Tr. at 161).

On July 28, 2010, K.S.'s mother reported that the increase in the medicine seemed to be working well, as she noticed that he was able to follow instructions and stay on task better. (Tr. at 289). On August 25, 2010, it was reported that K.S.'s medications were working great, and that K.S. was pleasant and easy to engage. (Tr. at 288).

### A. ALJ Decision

The ALJ issued an unfavorable decision dated February 4, 2011. (Tr. at 9-28). In the decision, the ALJ concluded that K.S. had not engaged in substantial gainful activity since April 19, 2010, the application date. (Tr. at 15). The ALJ determined that K.S. suffered from the severe impairments of: "attention deficit hyperactivity disorder, and pervasive developmental disorder, NOS." *Id.* The ALJ concluded that neither these impairments, nor a combination of his impairments, met or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ then determined that K.S. did not have an impairment or combination of impairments that functionally equals the listings, as K.S. had a less than marked limitation in acquiring and using information; a marked limitation in attending and completing tasks; a less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; a less than marked limitation in the ability to care for himself; and, no limitation in health and physical well-being. (Tr. at 15; 20-24).

Because K.S. did not agree with the ALJ's decision, a timely request for review of hearing decision was filed, dated March 7, 2011. (Tr. at 7-8; 257). The Appeals Council denied K.S.'s request, in an order dated September 23, 2011. (Tr. at 1-6). K.S. has exhausted all administrative remedies.

## II. Discussion

### A. Legal Standard

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue,* 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (*quoting Nicola*, 480 F.3d at 886).

### B. Whether K.S. Met, Medically Equaled or Functionally Equaled a Listed Impairment

Holtsman challenges the ALJ's finding that K.S. did not functionally equal a listed impairment. Functional equivalency means that an impairment is of listing-level severity, if there is "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. The domains are "broad areas of functioning intended to capture all of

8

what a child can or cannot do," and include: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1).

A "marked" limitation is a limitation that is "more than moderate" but less than extreme," or "equivalent to standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *See* 20 C.F.R. § 416.926a(e)(2)(i) (2011). The ALJ should find "a 'marked' limitation in a domain when [a child's] impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). The ALJ found that K.S. had a marked limitation in attending and completing tasks, but found less than marked limitations in the areas of interacting and relating to others; moving about and manipulating objects; and the ability to care for himself, as well as no limitation in health and physical well being. (Tr. at 15; 20-24). Holtsman challenges the ALJ's finding that K.S.'s limitation in the area of interacting and relating to others was less than marked.

To evaluate whether K.S. had a marked limitation in this area, the ALJ was required to consider such factors as how well the child "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i)(2011). A child the same age as K.S. is evaluated according to the following criteria:

9

Case 3:11-cv-05109-NKL   Document 11   Filed 08/17/12   Page 9 of 16

> [Y]ou should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups. You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v)(2011).

The portions of the record which present evidence of problems in the domain of interacting with others include: 1) a 2009 multidisciplinary report by K.S.'s school district which documented struggles with peer interaction and social communication; 2) 2009 psychiatric records showing poor eye contact and odd speech; 3) incidents of fighting and other discipline problems at school and at home; 4) his mother's comments about his social awkwardness and interaction problems; and 5) 2010 forms completed by school staff and his nurse practitioner stating he had marked limitations in this domain.

The ALJ noted in his decision K.S.'s difficulty interacting with others and his tendency to withdraw, but he discounted the importance of this evidence by noting that recent treatment records indicate improvement in this area and that K.S.'s behavior problems at school have decreased since receiving treatment. Holtsman challenges this analysis by arguing that the ALJ's finding of improvement was inappropriate and that the ALJ improperly discounted the findings of the two individual functional assessments completed by officials evaluating K.S.

10

In the multidisciplinary team report, dated November 30, 2009, the school district noted that:

> During the period of August 2008 to present the following behavioral concerns were documented by office staff: Kyle had 5 discipline/behavior referrals during the period of August 2008 to May 2009 and 1 discipline/behavior referral during the period of August 2009 to October 2009. Reasons for the referrals include fighting and inappropriate physical contacts. The only referral Kyle had this school year has been for inappropriate physical contact.

(Tr. at 251).

Holtsman argues that it was inappropriate for the ALJ to conclude that K.S.'s problems had decreased since receiving treatment because the school district's report, while showing only one discipline referral during the 2009 school year, only covered the limited period of August to October 2009, and thus cannot be compared fairly to the number of disciplinary actions for the entire previous school year. However, a review of the record reveals other evidence of improvement in K.S.'s symptoms besides the statement in the district report. In November 2009, four months before his application, a school report indicated K.S.'s communication skills were normal. [Tr. 200-01]. In February 2010, two months before he filed his application for disability, a school performance plan reported that K.S. interacted and got along with most students, that he only had problems with certain students in certain situations, and that his interactions with his peers had improved, as well as his behavioral problems since the last year. (Tr. 178). It also noted that K.S. made a strong effort to get along with and respect authority figures. *Id.* In August 2010, only a few months after K.S. filed his application, his mental health

nurse practitioner noted that K.S. received positive benefits from current medications, was pleasant and easy to engage, and displayed normal affect and activity. [Tr. 288]. At the same visit, K.S's mother said his medications were "doing great" and K.S. himself reported that he could focus very well at school. *Id.* A teacher's evaluation also noted that his behavior improved when he took his medications. [Tr. 150-51]. The record also lacks evidence during this period in 2010 that K.S. engaged in any behavior suggesting serious or marked problems.

    As evidence of K.S.'s problems during this period, Holtsman points to the two Individual Functional Assessments done in 2010, which stated that K.S. had marked limitations in interacting and relating with others. The two functional assessments were completed by Angela Herndon, a nurse practitioner; and jointly by Mr. Neill, K.S.'s special education teacher, and Ms. Hensley, his counselor. None of these individuals are considered "acceptable medical sources" under SSR 06-03p, with the latter two being considered "non-medical sources." 8 C.F.R. § 416.913(a) (2011) (non-doctor is not an acceptable medical source, "who can provide evidence to establish an impairment," but is an important "other" medical source of information). Social Security regulations require the ALJ to evaluate these sources using the same general criteria used to evaluate acceptable medical sources, such as "the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that

Case 3:11-cv-05109-NKL   Document 11   Filed 08/17/12   Page 12 of 16

tend to support or refute the opinion." SSR 06-03P, * 4. Not every factor for weighing opinion evidence will apply in every case. *Id.*

Here, a review of the ALJ"s analysis of these assessments indicates that it was not legal error to discount their weight. The ALJ engaged in a lengthy evaluation of the assessments, considering factors such as the degree of information presented by the officials and the degree of consistency of the assessment when compared to the rest of the record. For example, the ALJ found some of Mr. Neill and Ms. Hensley's observations consistent with the rest of the record, in that they stated that K.S.'s ability to complete tasks improved markedly when he took his medications. However, the ALJ found that they did not provide any explanation as to their assessment that K.S. has a marked limitation in interacting with others, a factor which is proper to consider when assessing the overall weight to be given to the opinion.

The discounting of the Individual Functional Assessment by K.S.'s nurse practitioner, Angela Herndon, is also based on evidence in the record. Herndon's assessment states that K.S. suffered from marked limitations in all domains except moving about and manipulating objects, in which she found K.S. to suffer less than marked limitation. However, the ALJ correctly noted that Herndon's opinion is inconsistent with the record as a whole in several areas. For example, the school district's Evaluation Report found K.S. to have no impairment in his motor skills, yet Herndon found that K.S. suffered marked limitations in moving about and manipulating objects. [*See e.g.* Tr. 252]. Further, Herndon found that K.S. had a marked limitation in acquiring or using

13

information but the record does not indicate such an impairment, instead showing K.S. to be an honor roll student who is at grade level academically and has no problems in acquiring information. [*See e.g.* Tr. at 145]. Herndon's assessment was also done in checklist format with no explanation, which the ALJ used as a factor, along with its general inconsistency with the record, in determining that little weight should be afforded to the opinion. Such an analysis was proper under SSR 06-03P.

As discussed above, the ALJ's conclusion that K.S. did not functionally equal a listed impairment did not constitute legal error. In any event, a review of the entire record indicates that the ALJ's conclusions were supported by substantial evidence on the record. Though symptoms of social and communicative impairment were shown by K.S, such as reports of problems with eye contact and withdrawal, this evidence taken alone can reasonably be construed as a less than marked impairment based on the record discussed above.

### B. Whether the ALJ Applied a Proper Credibility Analysis

Holtsman argues that the ALJ failed to address K.S.'s credibility and only addressed Holtsman's allegations and testimony in passing. When an ALJ determines that a claimant's subjective complaints of pain are not credible, the ALJ must provide specific reasons for his credibility finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991). The ALJ should give full consideration to all of the evidence presented relating to subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to matters such as: 1) the claimant's daily

activities; 2) the duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. 739 F.2d 1320, 1321-22. "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Id.*

Here, the ALJ gave Holtsman's testimony "some weight," stating that Holtsman's testimony regarding K.S.'s limitations was consistent with the record but that those limitations did not rise to the level of disability. Such a credibility finding was proper, as the ALJ elaborated in detail Holtsman's testimony [Tr. 16-17] and found much of it consistent with the medical record, but found that even if accepted as credible, it did not support a finding of disability. The ALJ did discount Holtsman's testimony that K.S's medication wore off in the evenings, but supported this finding by noting that Holtsman had never reported this to treating providers and had in fact told her treating providers that the medication was effective. The ALJ also documented K.S.'s testimony in detail. As K.S. testified that he agreed with his mother's testimony [Tr. 17], the ALJ's credibility findings towards Holtsman also apply to him. Further, none of the independent testimony of K.S. cited in the decision, even if fully accepted as credible, supports a finding of marked limitation in the challenged domain, and Holtsman has not pointed to any other testimony by K.S. which should have been considered by the ALJ.

**III. Conclusion**

It is hereby ORDERED that Plaintiff Shelli Holtsman's Social Security Complaint [Doc. # 10] is DENIED and the ALJ's judgment is AFFIRMED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 17, 2012
Jefferson City, Missouri